UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------x
In re:

EMPIRE GENERATING CO, LLC, *et al.*,

                    Debtors.

                                                     **OPINION AND ORDER**

---------------------------------------------------------------------x
ASSF IV AIV B HOLDINGS III, L.P.; AEIF TRADE,
LLC; SPT INFRASTRUCTURE FINANCE SUB-1, LLC;
and SPT INFRASTRUCTURE FINANCE SUB-2, LTD.,

                                          Lead Case
                        Appellants,                  19-CV-5721 (CS)

     - against -
                                          Consolidated Action
                                          19-CV-5744 (CS)
EMPIRE GENERATING CO, LLC; EMPIRE GEN
HOLDCO, LLC; EMPIRE GEN HOLDINGS, LLC; and
TTK EMPIRE POWER, LLC,

                        Appellees.

---------------------------------------------------------------------x
BLACK DIAMOND CAPITAL MANAGEMENT, L.L.C.,

                        Intervenor.

---------------------------------------------------------------------x

Appearances:

Brian E. Schartz
James H.M. Sprayregen
Kirkland & Ellis LLP
Kirkland & Ellis International LLP
New York, New York

Anup Sathy
Alexandra Schwarzman
Kirkland & Ellis LLP
Kirkland & Ellis International LLP
Chicago, Illinois

George W. Hicks, Jr.
Aaron L. Nielson
Damon C. Andrews
Kirkland & Ellis LLP
Kirkland & Ellis International LLP
Washington, D.C.
*Counsel for Appellants ASSF IV AIV B Holdings III, L.P.*
*and AEIF Trade, LLC*

Steven M. Abramowitz
Marisa Antos-Fallon
Vinson & Elkins LLP
New York, New York
*Counsel for Appellants SPT Infrastructure Finance Sub-1, LLC*
*and SPT Infrastructure Finance Sub-2, Ltd*

Peter S. Partee, Sr.
Robert A. Rich
Michael S. Legge
Hunton Andrews Kurth LLP
New York, New York

Michael P. Richman
Steinhilber Swanson LLP
Madison, Wisconsin
*Counsel for Appellees Empire Generating Co, LLC;*
*Empire Gen Holdco, LLC; Empire Gen Holdings, LLC;*
*and TTK Empire Power, LLC*

Christine A. Okike
Skadden, Arps, Slate, Meagher & Flom LLP
New York, New York

Albert L. Hogan III
Skadden, Arps, Slate, Meagher & Flom LLP
Chicago, Illinois

Carl T. Tullson
Skadden, Arps, Slate, Meagher & Flom LLP
Wilmington, Delaware
*Counsel for Intervenor Black Diamond*
*Capital Management, L.L.C.*

Seibel, J.

Before the Court is the appeal of minority lenders ASSF IV AIV B Holdings III, L.P.; AEIF TRADE, LLC; SPT Infrastructure Finance Sub-1, LLC; and SPT Infrastructure Finance Sub-2, Ltd (together, "Appellants"), from the Bankruptcy Court's Order Authorizing and Directing the Debtors to Assume Restructuring Support Agreement. (Bankr. Doc. 98 ("RSA Order").)[1] Appellants also move for leave to appeal from the Bankruptcy Court's Order (A) Approving Bid Procedures Relating to the Sale of Substantially All the Assets of Empire Generating Co, LLC or Interests in Empire Gen Holdings, LLC, (B) Establishing Procedures in Connection with the Assumption or Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (C) Approving Notice Procedures, (D) Approving Stalking Horse Bid Protections, and (E) Granting Related Relief, (Bankr. Docs. 99, 102 ("Bid Procedures Order")).[2] (Doc. 3.) For the following reasons, Appellants' motion for leave to appeal from the Bid Procedures Order is DENIED, and the Bankruptcy Court's RSA Order is AFFIRMED.

I. **BACKGROUND**

The following facts are taken from the record generated in the bankruptcy case. On May 19, 2019, ("Petition Date"), Empire Generating Co, LLC ("Empire Generating") and certain of its affiliates (together, "Appellees" or "Debtors") – specifically, Empire Gen Holdco, LLC, ("Holdco"), Empire Gen Holdings, LLC, ("Holdings"), and TTK Empire Power, LLC, ("TTK Empire") – filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, (Bankr.

---

[1] "Bankr. Doc." refers to documents filed in the U.S. Bankruptcy Court for the Southern District of New York under docket number 19-23007. "Doc." refers to a document filed in this Court under Case No. 19-CV-5721 unless it is preceded by a different docket number. "RSA" refers to the Restructuring Support Agreement. All party names are spelled according to how they appear in Exhibit 3 to Appellants' notice of appeal. (Doc. 1-3.)

[2] The Bid Procedures Order appears on the bankruptcy docket twice, apparently in error.

Doc. 1), and requested joint administration of their respective cases, which request the Bankruptcy Court granted on May 21, 2019, (Bankr. Docs. 2, 34).[3]

## A.    The Parties

Debtor Empire Generating owns and operates a power plant in Rensselaer, New York. (Bankr. Doc. 3 ("Venteicher Decl.") ¶ 7.)  Debtor TTK Empire owns 100 percent of the membership interests in Debtor Holdings, which owns 100 percent of the membership interests in Debtor Holdco, which owns 100 percent of the membership interests in Empire Generating. (*Id.* ¶ 6.)  Nondebtor Tyr Energy, Inc. owns 100 percent of the membership interests in nondebtor Tyr TTK Power, LLC, which owns 50 percent of the membership interests in nondebtor TTK Power, LLC, which owns 100 percent of the membership interests of Debtor TTK Empire.  (*Id.*)

Appellants are lenders that own approximately 45 percent of Appellees' secured debt. (Doc. 27 ("Appellants' Br.") at 1; Doc. 40 ("Appellees' Br.") at 8; Doc. 41 ("I's Br.") at 4.) Intervenor Black Diamond Capital Management, LLC ("Black Diamond" or "Intervenor"), its affiliates, and funds managed by MJX Asset Management LLC (together, "Majority Lenders") own the remaining 55 percent.  (Appellees' Br. at 8; I's Br. at 4-5.)[4]

The relationships among the parties are governed by a series of prepetition agreements. The Debtors' business is financed under a Credit and Guaranty Agreement, which provides Empire Generating with $480 million in secured credit facilities (the "Credit Facility"), with

---

[3] Empire Generating's bankruptcy case is No. 19-23007; Holdco's is No. 19-23006, Holdings' is No. 19-23008, and TTK Empire's is No. 19-23009.  All four bankruptcy cases are jointly administered under docket number 19-23007.

[4] None of the parties cited to evidence in the record supporting Appellants' or Intervenor's ownership of Appellees' debt, but no party disputes the debt ownership.

Holdco and Holdings guaranteeing the debt.  (Venteicher Decl. ¶ 21; *see id.* Ex. M.)  The obligations of Empire Generating, Holdco, and Holdings under the Credit Facility are secured by liens on substantially all of their assets.  (*Id.* ¶ 22.)  Those obligations are also secured by a lien on TTK Empire's membership interests in Holdings, which are pledged by TTK Empire in favor of the Collateral Agent – the agent empowered to act on behalf of the lenders – under a prepetition Pledge Agreement dated February 23, 2017.  (*Id.*; *see id.* Ex. N ("Pledge Agreement").)  TTK Empire's pledge is a non-recourse obligation, meaning the creditor cannot look to TTK Empire for payment of the underlying debt.  (Pledge Agreement § 6.25.)

As of the Petition Date, the outstanding principal balance under the Credit Facility was $353,436,448.  (Venteicher Decl. ¶ 22)  Rights and remedies with respect to the collateral are governed by a Collateral Agency and Intercreditor Agreement, dated March 14, 2014.  (*Id.* ¶ 23; *see id.* Ex. L ("Intercreditor Agreement").)  That agreement provides, among other things, that the Collateral Agent will act solely for the benefit of the secured parties, (Intercreditor Agreement § 2.3), and that the Collateral Agent has the exclusive right to exercise remedies with respect to the collateral (including the right to credit bid the secured obligations) at the direction of parties holding more than 50 percent of the outstanding secured obligations, (*id.* §§ 1.1, 3.1).

**B.**    **RSA and Bid Procedures Orders**

On the Petition Date, following failure to negotiate an agreement out of court, Appellees entered into a purchase agreement and the RSA with the Majority Lenders and filed a motion seeking to assume the RSA.  (Bankr. Doc. 5 ("RSA Motion").)  The purchase agreement provided for a sale pursuant to 11 U.S.C. § 363 in which the Collateral Agent would credit bid all outstanding obligations under the Credit Facility in exchange for TTK Empire's equity interests in Holdings, thereby discharging the secured debt and paving the way for the purchase

of the power plant by Empire Acquisition LLC ("Stalking Horse Bidder"). (*See* Venteicher Decl. ¶¶ 5, 45-47, 60.) The RSA provided for, among other things, the parties' support for the credit bid and the confirmation and consummation by the Debtors of a joint reorganizing Chapter 11 plan that satisfied all allowed claims. (*Id.* ¶ 46; Bankr. Doc. 5-1 Ex. 1 ("RSA").)

Appellees also sought approval of certain procedures governing the credit bid, assumption and assignment of executory contracts and leases, and notice, as well as other related relief ("Bid Procedures Motion"). (Bankr. Doc. 6 at 15.)

Appellants filed an objection to both motions, asserting there, as they do here, that the Bankruptcy Court had cause to set aside the proposed credit bid (as supported by the RSA and the proposed Bid Procedures Order), because, among other things, it constituted an impermissible *sub rosa* plan, it would violate the Intercreditor Agreement, and there was no allowed secured claim against TTK Empire against which the credit bid could be offset. (Bankr. Doc. 61.) Appellants argued that the amount of the outstanding obligations under the Credit Facility, and therefore the amount of the credit bid, exceeded the actual value of the plant, thus satisfying the lenders' claims on paper but precluding them from voting against confirmation of the plan, which would give the Majority Lenders control over the new entity (the Stalking Horse Bidder).

On June 4, U.S. Bankruptcy Judge Robert D. Drain heard oral argument on the motions (Appellants' MFL Ex. B ("Hearing Tr.")), and granted them on June 10, (RSA Order; Bid Procedures Order).

### C.   Events Following Entry of the RSA and Bid Procedure Orders

On July 6, 2019, Appellees deemed the Stalking Horse Bidder to be the successful bidder under the Bid Procedures Order and cancelled the auction that would have taken place had there

been another viable bidder. (Bankr. Doc. 184.) On September 18, after a hearing held September 16, (*see* Bankr. Doc. 307), the Bankruptcy Court entered an order approving the sale, (Bankr. Doc. 298 ("Sale Order")). Thereafter, the Court issued findings of fact and conclusions of law and an order confirming Appellees' Chapter 11 plan. (Bankr. Doc. 304 ("Plan Order").) Appellants appealed from the Sale and Plan Orders, and those appeals are currently pending before Judge Nelson S. Roman. (*See* Nos. 19-CV-9111, 19-CV-9146.)

### D. Procedural History

On June 17, 2019, Appellants timely filed Notices of Appeal of the Bid Procedures Order and the RSA Order with the Bankruptcy Court. (Bankr. Docs. 122-123.) The appeal from the Bid Procedures Order was docketed in this Court as No. 19-CV-5744, and the appeal from the RSA Order was docketed in this Court as No. 19-CV-5721. That same day, Appellants filed a motion for leave to appeal from the Bid Procedures Order, which contained a memorandum of law in support. (Bankr. Doc. 124; No. 19-CV-5744 Doc. 3 ("Appellants' MFL").)

On June 25, Appellants made an unopposed motion to consolidate the cases, (Docs. 4, 6), which U.S. District Judge Kenneth M. Karas granted under 19-CV-5721, (Doc. 7).[5]

On July 1, Appellees opposed Appellants' motion for leave to appeal. (Doc. 9 ("Appellees' MFL Opp.").) Black Diamond filed an unopposed motion to intervene, (Docs. 11, 14-15), which Judge Karas granted on July 8, (Doc. 16). Thereafter, Intervenor opposed Appellant's motion for leave to appeal. (Doc. 17. ("I's MFL Opp.").)

---

[5] This case was originally assigned to Judge Karas, reassigned to Chief Judge Colleen McMahon on November 25, 2019, and reassigned to this Court on December 2, 2019.

On August 19, Appellants filed their opening brief, (Appellants' Br.), which Appellees and Intervenor opposed on September 18, (Appellees' Br.; I's Br.).  Appellants replied on October 2.  (Doc. 42 ("Appellants' Reply").)

## II.  APPELLANTS' MOTION FOR LEAVE TO APPEAL

### A.  Whether the Bid Procedures Order Is Interlocutory or Final

This Court has jurisdiction to hear appeals from decisions of a bankruptcy court pursuant to 28 U.S.C. § 158(a), which provides in pertinent part that "[t]he district courts of the United States shall have jurisdiction to hear appeals . . . from final judgments, orders, and decrees; . . . [and,] with leave of the court, from other interlocutory orders and decrees . . . of bankruptcy judges."  28 U.S.C. § 158(a)(1), (3).  "Orders in bankruptcy cases qualify as 'final' when they definitively dispose of discrete disputes within the overarching bankruptcy case."  *Ritzen Grp., Inc. v. Jackson Masonry, LLC*, No. 18-938, 2020 WL 201023, at *2 (U.S. Jan. 14, 2020).  "[T]he order need not resolve all of the issues raised by the bankruptcy; but it must completely resolve all of the issues pertaining to a discrete claim, including issues as to the proper relief."  *U.S. Bank Nat'l Ass'n v. Lehman Bros. Holdings Inc.* (*In re Lehman Bros. Holdings Inc.*), 566 B.R. 353, 359 (S.D.N.Y. 2017) (internal quotation marks and emphasis omitted).

The parties dispute whether the Bid Procedures Order is a final order and therefore appealable as of right.  (*See* Appellants' MFL at 9; Appellees' MFL Opp. at 8-9; I's MFL Opp. at 4-5.)  Appellants argue that the Bid Procedures Order is final is because it "finally disposes of the discrete dispute over whether the Collateral Agent should be permitted to credit bid the full amount of the secured debt."  (Appellants' MFL at 9 (internal quotation marks and alterations omitted); *see* Appellants' Reply at 7 n.2.)  But the Bankruptcy Court expressly cabined its ruling that Appellants did not have standing to object to a credit bid to "the record before the Court as

of the date of the hearing," leaving open the possibility that "some fact" learned later could form the "basis to object." (Hearing Tr. at 167:6-22.) The possibility of Appellants' future objection shows that the Order did not "finally dispose" of the issue whether the Collateral Agent was permitted to credit bid the full amount of the secured debt.

A lack of finality is further shown by the fact that the Bid Procedures Order did not approve the sale, which was subject to further order of the Bankruptcy Court. Moreover, the auction could have included other bids, including a cash bid from Appellants. *See Hybrid Tech Holdings, LLC v. Official Comm. of Unsecured Creditors of Fisker Auto. Holdings* (*In re Fisker Auto. Holdings, Inc.*), No. 14-CV-99, 2014 WL 546036, at *3 (D. Del. Feb. 7, 2014) (bid procedures order not final where appellant had remedy in form of cash bid at auction). Appellants' "rights ha[ve] not been fully adjudicated" where, as here, the challenged order leaves "much work . . . for the Bankruptcy Court." *DSP Acquisition, LLC v. Free Lance-Star Pub. Co. of Fredericksburg*, 512 B.R. 808, 812 (E.D. Va. 2014) (internal quotation marks omitted). Accordingly, the Bid Procedures Order did not finally dispose of the issue of Appellants' relief with respect to the credit bid.[6]

_____

[6] Intervenor also argues that Appellants' June 26 objection to the sale motion rehashes the same objections Appellants made to the Bid Procedures Order, showing that the Order is not final. (I's MFL Opp. at 5.) Intervenor likens Appellants' latter objections to "a motion for reargument," which "postpones a party's ability to appeal a bankruptcy court's judgment until resolution of that motion." *Pu v. Grubin* (*In re Food Mgmt. Grp., LLC*), 428 B.R. 576, 578 (S.D.N.Y. 2009); I's MFL Opp. at 5 n.4. But in the case cited by Intervenor, the appellant had actually made a motion for reargument, which the court treated as a motion for amendment of judgment under Rule 9023 of the Federal Rules of Bankruptcy Procedure. *Id.* Here, it is far from clear that Appellants' advancement of the same arguments in objection to the sale order amounted to a motion for reargument or amendment of judgment. But because Appellants' objection to the sale motion covers the same ground as this putative appeal and incorporates the arguments made at the Hearing, (Bankr. Doc. 176 at 5-10), it at least shows that Appellants believed they had another avenue for the same relief that they had previously sought. To the

Thus, the Bid Procedures Order is interlocutory and not appealable as of right.

**B.      Whether Leave to Appeal Is Granted**

"Even when orders are not 'final,' under 28 U.S.C. § 158(a)(3), district courts have jurisdiction to hear appeals from interlocutory orders and decrees with leave of the court." *Sterling v. Harrison* (*In re Sterling*), No. 17-CV-248, 2018 WL 1157970, at *3 (S.D.N.Y. Mar. 2, 2018) (citing *Gibson v. Kassover* (*In re Kassover*), 343 F.3d 91, 94 (2d Cir. 2003)), *appeal dismissed*, No. 18-995, 2018 WL 4859355 (2d Cir. July 23, 2018); *see also* Fed. R. Bankr. P. 8004 (providing procedure for appeal requiring leave).

"To determine whether leave to appeal should be granted, district courts apply the standards prescribed in 28 U.S.C. § 1292(b)." *Credit One Fin. v. Anderson* (*In re Anderson*), 550 B.R. 228, 234 (S.D.N.Y. 2016). A court may grant leave if the underlying order (1) "involves a controlling question of law," (2) "as to which there is substantial ground for difference of opinion," and (3) "an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). "The 'would-be appellant' has the burden of establishing all three elements." *Reifler v. N.C. Mut. Life Ins. Co.* (*In re Reifler*), No. 18-CV-2559, 2018 WL 3212464, at *4 (S.D.N.Y. June 28, 2018) (quoting *Casey v. Long Island R.R.*, 406 F.3d 142, 146 (2d Cir. 2005)). "In addition, a party seeking leave to appeal a non-final order must demonstrate exceptional circumstances to overcome the general aversion to piecemeal litigation and to justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment." *Dev. Specialists, Inc. v. Akin Gump Straus*

---

extent Appellants' subjective belief matters, their June 26 objection supports the Bid Procedures Order's lack of finality.

*Hauer & Feld, LLP* (*In re Coudert Bros. LLP Law Firm Adversary Proceedings*), 447 B.R. 706, 711 (S.D.N.Y. 2011) (internal quotation marks omitted).

"A question of law under Section 1292(b) refers to a pure question of law that the reviewing court could decide quickly and cleanly without having to study the record." *Chenault v. Gen. Motors LLC* (*In re Motors Liquidation Co.*), No. 16-CV-3764, 2017 WL 698387, at *2 (S.D.N.Y. Feb. 21, 2017) (internal quotation marks omitted). "[Q]uestions regarding application of the appropriate law to the relevant facts" and "mixed questions of law and fact" are generally "not appropriate for certification under § 1292(b)." *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 524, 536 (S.D.N.Y. 2014) (internal quotation marks omitted) (collecting cases).

The question as presented by Appellants is

> [w]hether the bankruptcy court erred by finding no cause under 11 U.S.C. § 363(k) to prevent the Collateral Agent from credit bidding the full amount of the secured debt, for assets that are indisputably worth less than that amount, solely to deprive the Minority Lenders of their ability to vote on the planned restructuring.

(Appellants' MFL at 9.) Appellants argue that "[w]hether cause exists to limit a credit bid is a question of law; and that question is obviously 'controlling.'" (*Id.* at 11 (citing *In re Antaeus Tech. Servs., Inc.*, 345 B.R. 556, 564 (Bankr. W.D. Va. 2005)).) But Appellants have not established that the question presented is a "pure question of law." *See In re Motors Liquidation Co.*, 2017 WL 698387, at *2. Appellants rely on *In re Antaeus*, in which the bankruptcy court considered the documentation and course of conduct in that case to conclude that an entity's right to credit bid under § 363 was limited. 345 B.R. at 564. The court styled its conclusion as a "conclusion of law," but it relied on findings of fact in so concluding. I therefore agree with Intervenor that *In re Antaeus* does not stand for the proposition that a "for cause" determination under § 363 is a question of law.

To the contrary, "it is left to the court to determine whether cause exists on a case-by-case basis," and "[t]he decision of whether to deny credit bidding based on cause is within the discretion of the court." *In re Aéropostale, Inc.*, 555 B.R. 369, 414-15 (Bankr. S.D.N.Y. 2016).[7] These determinations are the kind of fact-bound inquiries that are not appropriate for interlocutory review. Indeed, all three arguments that Appellants advance rely upon assessment of factual findings that would require this Court to "study the record." *In re Motors Liquidation Co.*, 2017 WL 698387, at *2 (internal quotation marks omitted). First, Appellants contend that the Bid Procedures Order cements an impermissible *sub rosa* reorganization that freezes out minority creditors to circumvent the Bankruptcy Code's safeguards. (Appellants' MFL at 11.) But as Intervenor rightly points out, and Appellants acknowledge, this argument requires analysis of the plan's design, the business justification for the transaction, and the Collateral Agent's reasons for bidding the full amount of the secured debt, (I's MFL Opp. at 8; *see* Appellants' MFL at 11-13), all of which are fact questions. On a different point, Appellants themselves highlight "[t]he unusual nature of the circumstances presented here," (Appellants' MFL at 13), underscoring that their appeal requires application of law to the relevant facts, *see In re Facebook, Inc.*, 986 F. Supp. 2d at 536.

Second, Appellants argue that the Bid Procedures Order would cause the Collateral Agent to violate its duties under the Intercreditor Agreement. (Appellants' MFL at 13.) But "[d]ifferences over contract construction are not the sort of 'controlling question of law' that normally gives rise to interlocutory certification." *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 206 F.R.D. 78, 94 (S.D.N.Y. 2002).

---

[7] Appellants concede that determining cause "involves some amount of discretion." (*See* Appellants' MFL at 10.)

Third, Appellants urge that the proposed credit bid was impermissible "because there is no allowed claim against TTK Empire for the credit bid to offset." (Appellants' MFL at 13.) Appellees do not address this argument. Intervenor contends that this argument, too, is fact-bound. (I's MFL Opp. at 9.) According to Appellants, § 363(k) does not grant the right to credit bid "with secured obligations," but rather the right to offset an allowed claim. (Hearing Tr. at 139:19-25.) At the Hearing, Judge Drain explained that it is "crystal clear" that "you always have the right to credit bid the debt, not the claim," which is "necessary to protect the creditor." (*Id.* at 141:12-20.) Appellants acknowledged as much but argued, "[T]his is not being done to protect the creditor. There are no other bids here." (*Id.* at 141:21-23.) Thus, Intervenor argues, Appellants "disagree[] with [the controlling law's] application to this case given the facts." (I's MFL Opp. at 9 (emphasis omitted).) I agree, and because Appellants' question requires application of law to the relevant facts, it is not a controlling question of law. *See In re Facebook, Inc.*, 986 F. Supp. 2d at 536.

For these reasons, Appellants have not established that the underlying order involves a controlling question of law, and interlocutory appeal is therefore unwarranted. *See In re Reifler*, 2018 WL 3212464, at *4.

Although I need not turn to the other two elements, Appellants have likewise failed to establish them. As to whether there is substantial ground for difference of opinion, such ground "exists when (1) there is conflicting authority on the issue, or (2) the issue is particularly difficult and of first impression for the Second Circuit." *In re Facebook*, 986 F. Supp. 2d at 539 (internal quotation marks omitted). Appellants must establish that there is "genuine doubt as to whether the [lower] court applied the correct legal standard in its order." *Id*. at 540 (internal quotation marks omitted).

Appellants marry their "difference of opinion" analysis into their "question of law" arguments, again pointing to their arguments on the existence of a *sub rosa* plan, violation of the Intercreditor Agreement, and the lack of an allowed claim against TTK Empire. As discussed below in connection with the appeal as of right from the RSA Order, Judge Drain correctly evaluated these issues. I have no "genuine doubt" that Judge Drain applied the correct standards, and thus Appellants have not established that there is substantial ground for difference of opinion.

Next, Appellants argue that immediate review of the Bid Procedures Order may materially advance the litigation. *See N. Fork Bank v. Abelson*, 207 B.R. 382, 390 (E.D.N.Y. 1997) ("[A]n immediate appeal must have the possibility of materially advancing the ultimate termination of the litigation.") (internal quotation marks omitted). First, given that these issues are being litigated in the appeal of the RSA Order and in the appeals of the Sale and Plan Orders, (*see, e.g.*, No. 19-CV-9111 Doc. 31), granting interlocutory appeal here would likely result in unnecessary duplication. Second, resolving issues related to managing a credit bid is "merely one procedural step in the complex, multi-step process in achieving a final disposition of these cases." *In re Fisker*, 2014 WL 546036, at *5 (internal quotation marks omitted) (denying leave to appeal). Appellants have offered no reason to think that review here would materially advance the litigation.

Finally, Appellants make no argument that there are exceptional circumstances here that warrant immediate review. *See Lehman Bros. Special Fin. Inc. v. BNY Corp. Tr. Servs. Ltd.* (*In re Lehman Bros. Holdings, Inc.*), 422 B.R. 403, 406 (S.D.N.Y. 2009). I conclude that no such circumstances exist. Indeed, if Appellants were right about any of the three issues that they

raise, the Court would so find in connection with the as-of-right appeal from the RSA Order, but as discussed below, their arguments fail.[8]

For the foregoing reasons, Appellants' motion for leave to appeal from the Bid Procedures Order is denied.

## III.  APPEAL AS OF RIGHT

### A.  Legal Standard

This Court has jurisdiction pursuant to 28 U.S.C. § 158(a)(1) to hear appeals from final judgments, orders, and decrees of a bankruptcy court.  A district court reviews a bankruptcy court's findings of fact for clear error and its legal conclusions *de novo*.  *Overbaugh v. Household Bank, N.A.* (*In re Overbaugh*), 559 F.3d 125, 129 (2d Cir. 2009) (*per curiam*). "When reviewing for clear error, [the court] may reverse only if [it is] left with the definite and firm conviction that a mistake has been committed."  *United States v. Bershchansky*, 788 F.3d 102, 110 (2d Cir. 2015) (internal quotation marks omitted).  "Thus, if the factual findings of the bankruptcy court are plausible in light of the record viewed in its entirety, this Court may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently."  *Savage & Assocs., P.C. v. Williams Commc'ns* (*In re Teligent Servs., Inc.*), 372 B.R. 594, 599 (S.D.N.Y. 2007) (internal quotation marks omitted). "And where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."  *In re Frontier Ins. Grp., Inc.*, 598 B.R. 87, 96 (S.D.N.Y. 2019) (internal quotation marks omitted).  The parties agree that the decision to approve or reject

---

[8] And conversely, if the Court were wrong in not certifying the appeal from the Bid Procedures Order, any such error would be harmless because the same issues are adjudicated in connection with the RSA Order.

the assumption of an executory contract is reviewed for abuse of discretion. (Appellants' Br. at 29; Appellees' Br. at 6; I's Br. at 2-3.)

**B.   Discussion**

The parties do not dispute that Appellants' appeal from the RSA Order is as of right. Appellants advance two main arguments in support of their appeal:  first, that the Bankruptcy Court erred by finding no cause to limit the § 363 sale, (Appellants' Br. at 30-58), and second, that it applied the wrong standard for approving assumption of the RSA, (*id.* at 58-65).

**1.   Mootness**

As an initial matter, Intervenor contends that this appeal must be dismissed as moot. (I's Br. at 14-18.)[9]  "[M]ootness is premised on the fundamental jurisdictional tenet that Federal courts are empowered to hear only live cases and controversies." *Varde Inv. Partners, L.P. v. Comair, Inc.* (*In re Delta Air Lines, Inc.*), 386 B.R. 518, 537 (Bankr. S.D.N.Y. 2008) (internal quotation marks omitted).  "Where it is impossible for the court to grant any effectual relief whatever to a prevailing party, a case is moot, and the federal courts lack subject matter jurisdiction over the action." *Dobrer v. PennyMac Corp.*, No. 18-CV-3174, 2018 WL 6437068, at *3 (E.D.N.Y. Dec. 7, 2018) (internal quotation marks and citation omitted).  In a bankruptcy appeal, "'mootness concern arises when . . . it may be impossible for a court to grant effective relief because the disputed assets have been transferred pursuant to the reorganization plan.'" *Metro Prop. Mgmt. Co. v. Info. Dialogues, Inc.* (*In re Info. Dialogues, Inc.*), 662 F.2d 475, 476 (8th Cir. 1981) (*per curiam*).

---

[9] Appellees argued only that the Bid Procedures Order, which I am not reviewing in any event, is moot.  (Appellees' Br. at 25-29.)

According to Intervenor, the Bankruptcy Court's approval of the Sale and Plan Orders created separate obligations to carry out the sale, so "modifying or vacating the RSA Order . . . will not unwind the bankruptcy court's final approval of the credit bid in the Sale." (I's Br. at 16.) That may be so, but the RSA is broader than the Sale and Plan Orders because it includes covenants pertaining to, among other things, exit financing and corporate governance. (Appellants' Reply at 4.) Accordingly, were I to vacate the RSA Order, I would be able to grant some "effectual relief" to Appellants by, for example, unwinding those provisions. The appeal from the RSA Order is therefore not moot.

Next, Intervenor argues that review of the RSA Order is unnecessary because Appellants are likely to appeal from the Sale and Plan Orders, thereby creating "piecemeal" appeals. (I's Br. at 17 (internal quotation marks omitted).)[10] Intervenor relies on *In re Worldcom, Inc.* for the proposition that "[t]raditional finality concerns still dictate . . . that we avoid having a case make two complete trips through the appellate process." (I's Br. at 18 (quoting *In re Worldcom, Inc.*, No. M-47, 2003 WL 21498904, at *6 (S.D.N.Y. June 30, 2003) (internal quotation marks and alteration omitted)).) It is true that the "pragmatic approach to finality [in bankruptcy proceedings] does not overcome the general aversion to piecemeal appeals." *Bank Brussels Lambert v. Coan* (*In re AroChem Corp.*), 176 F.3d 610, 619 (2d Cir. 1999) (internal quotation marks omitted). But in the cases cited by Intervenor, the piecemeal-appeals issue arose in the context of whether the order appealed from was interlocutory or final,[11] whereas here, there is no

_____

[10] As mentioned, Appellants did in fact appeal from those orders. (*See* Nos. 19-CV-9111, 19-CV-9146.)

[11] *See In re AroChem*, 176 F.3d at 619; *Everett v. Perez* (*In re Perez*), 30 F.3d 1209, 1216-17 (9th Cir. 1994); *In re Worldcom, Inc.*, 2003 WL 21498904, at *6; *Nova Info. Sys. Inc. v. Premier Operations, Ltd.* (*In re Premier Operations*), 290 B.R. 33, 42 (S.D.N.Y. 2003). It is unclear how *Bowers v. Connecticut Nat'l Bank*, which mentions piecemeal appeals in the context

dispute that the RSA Order is final. Intervenor has not pointed to any authority condoning the dismissal of appeals from final orders in the interest of judicial economy. Accordingly, I turn to the merits.

### 2. Cause to Limit the § 363 Sale

Under 11 U.S.C. § 365(a), a bankruptcy trustee, "subject to the court's approval, may assume or reject any executory contract . . . of the debtor." The parties do not dispute that the RSA is an executory contract. (*See* Appellants' Br. at 58-59; I's Br. at 20-21.) Under § 365, the Bankruptcy Court issued the RSA Order approving Debtors' assumption of the RSA, which provides for a sale other than in the ordinary course of business.

Under § 363(b), "[t]he trustee, after notice and a hearing may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). For sale of "property that is subject to a lien that secures an allowed claim, . . . the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." *Id.* § 363(k). But that right to bid is limited where "the court for cause orders otherwise." *Id.* Appellants raise three arguments in support of their contention that the Bankruptcy Court erred in entering the RSA Order and not finding cause to limit the credit bid. I address each in turn.[12]

_____

of the "view that courts of appeals lack jurisdiction over appeals from orders of district courts remanding for significant further proceedings in bankruptcy courts," applies to this argument. 847 F.2d 1019, 1023 (2d Cir. 1988) (internal quotation marks omitted).

[12] The thrust of each of Appellants' arguments is that the credit bid as a whole is improper, and that the RSA and the Bid Procedures Order support the credit bid, so they are improper as well. Appellants made the same three arguments in support of their motion for leave to appeal the Bid Procedures Order, which, as discussed, is denied. Appellants do not explain how their complaints here arise out of issuance of the RSA Order alone, and they make points that are premature and might more properly be made on appeal from the Sale or Plan Orders. In sum, it seems like Appellants are using this appeal from an order approving collateral

a.    *Sub Rosa* Plan

Appellants argue that the RSA Order amounts to a prohibited *sub rosa* reorganization that "us[es] an asset sale to deny Appellants their right to vote on the proposed restructuring." (Appellants' Br. at 32.)  To approve a § 363(b) sale, the judge must "expressly find from the evidence presented before him at the hearing a good business reason to grant such an application."  *Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1071 (2d Cir. 1983).  The judge "should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike."  *Id.*  But such a sale is prohibited if it amounts to a *sub rosa* plan, which "short circuit[s] the requirements of Chapter 11 for confirmation of a reorganization plan."  *Iridium Capital Corp. v. Official Comm. of Unsecured Creditors* (*In re Iridium Operating LLC*), 478 F.3d 452, 466 (2d Cir. 2007) (internal quotation marks and alteration omitted).

This argument is premature and, in any event, unavailing.  The RSA does not cement a reorganization.  *See In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 886 (Bankr. S.D.N.Y. 1990) (pre-confirmation transaction did not circumvent Chapter 11 protections where "no finality is proposed and the confirmation process is to proceed").  As Judge Drain observed at the Hearing, the RSA is an agreement about "supporting things," (Hearing Tr. at 152:19) – not an approval of the sale.  All plan terms remained subject to confirmation of the plan.  (*See* Appellees' Br. at 16 ("[T]he RSA does not bind the Debtors to certain plan treatment.").)  And the RSA left open the possibility that an offer better than the Stalking Horse bid could be made

transactions to attack the entire credit-bid process.  Nevertheless, in an excess of caution, I address Appellants' arguments as to the credit bid.  I emphasize that I am reviewing only the RSA Order, not the Sale or Plan Orders.

and accepted.  (RSA at 1-2.)  The RSA simply did not, as Appellants argue, "settle the precise

outcome of the reorganization."  (Appellants' Br. at 36.)

Appellants contend that the RSA Order impermissibly restricts their voting rights in

violation of the Bankruptcy Code.  (*Id.* at 37-39.)  But that is an effect not of the RSA Order but

of the Intercreditor Agreement, which allowed the Majority Lenders to direct the Collateral

Agent to credit bid the full amount of the secured loans, rendering Appellants' interests

unimpaired (at least as a technical matter) and thus stripping them of their right to vote on the

reorganization plan.  While the Bankruptcy Code provides that secured creditors have the right to

vote for on reorganization plans where such a plan might impair their rights, *see* 11 U.S.C.

§ 1126, "a prepetition waiver of bankruptcy rights is not invalid *per se*," *In re GSC, Inc.*, 453

B.R. 132, 164 n.47 (Bankr. S.D.N.Y. 2011).  Indeed, "plainly worded contracts establishing

priorities and limiting obstructionist, destabilizing and wasteful behavior should be enforced and

creditor expectations should be appropriately fulfilled."  *Ion Media Networks, Inc. v. Cyrus

Select Opportunities Master Fund, Ltd.* (*In re Ion Media Networks, Inc.*), 419 B.R. 585, 595

(Bankr. S.D.N.Y. 2009), *appeal dismissed*, 480 B.R. 494 (S.D.N.Y. 2012), *appeal withdrawn*,

No. 12-4545 (2d Cir. Aug. 19, 2013).  "Courts have generally refused to rewrite agreements to

provide minority lenders with any rights, . . . which are not expressly set forth in the

agreements."  *New Bank of New Eng., N.A. v. Toronto-Dominion Bank*, 768 F. Supp. 1017, 1021

(S.D.N.Y. 1991).

As Judge Drain correctly acknowledged, any limitation on Appellants' voting rights

arises out of their own agreement.  (Hearing Tr. at 133:22-134:4.)  Appellants conceded that they

granted the Collateral Agent the sole authority to credit bid.  (*Id.* at 125:11-13.)  And they do not

dispute that the Majority Lenders are fully authorized to direct a credit bid.  They are

sophisticated parties who no doubt understood the implications of the agreement when they bought the debt. Appellants have advanced no reason why the Court should rewrite the Intercreditor Agreement to provide them with rights beyond those for which they bargained. Accordingly, Appellants' argument is without merit.

Appellants argue that other rights are also impaired by the credit bid. (Appellants' Br. at 39-41.) Specifically, they contend that the purchase agreement seeks nonconsensual "third-party releases that would bind Appellants without their consent." (*Id.* at 39-40.) But this appeal challenges the RSA Order, not the purchase agreement, and there is no contention that the RSA provides for such releases.[13] Accordingly, this objection is not ripe, and Appellants' reliance on cases involving nonconsensual third-party releases as part of confirmation plans[14] is unavailing.

Next, Appellants contend that the absence of a good business reason for the credit bid evidences a *sub rosa* plan. (Appellants' Br. at 41-45.) They claim that Appellees admitted that it was a bad time to sell the power plant, and that the opening bid (at the full amount of the secured debt) was too high and chilled bidding. (*Id.* at 42-45.) I agree with Intervenor that assets being sold under § 363 are often distressed, and therefore during a Chapter 11 case may never be a "good time" to sell. (*See* I's Br. at 47 n.15.) So it cannot be that a "good business reason" requires that it be a "good time" to sell. And, in any event, whether a good business reason

---

[13] Intervenor argues that, in any event, the purchase agreement and Plan do not release Appellants' direct claims and that Appellants might lack standing to pursue derivative claims against Delaware LLCs. (I's Br. at 50 n.17.) But I need not reach those arguments here.

[14] *See Deutsche Bank AG v. Metromedia Fiber Network, Inc.* (*In re Metromedia Fiber Network, Inc.*), 416 F.3d 136, 142 (2d Cir. 2005) (noting, on motion to challenge confirmed plan, that "a nondebtor release is a device that lends itself to abuse"); *Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 940 (5th Cir. 1983) (finding, on motion to approve transaction, transaction that released all claims against debtor not authorized by § 363(b)).

exists is a question for the bankruptcy court when "determining a § 363(b) [sale] application," *In re Lionel Corp.*, 722 F.2d at 1071, not when considering the assumption of a supporting executory contract preliminary thereto.[15] So this argument is also without merit.

Finally, Appellants argue that the Bankruptcy Court did not "meaningfully address[]" their *sub rosa* plan arguments. (Appellants' Br. at 45; *see id.* at 45-47.) The record reveals that Judge Drain considered and rejected those arguments. He identified the "one issue" facing Appellants as the fear that Intervenor "is going to run roughshod over your shareholder rights once it is the controlling shareholder of the purchase vehicle." (Hearing Tr. at 150:1-4.) He "protected" that issue, "as far as the bankruptcy process is concerned," as much as he could. (*Id.* at 150:4-5.) And he rejected the contention that this is a *sub rosa* plan as "[n]onsense." (*Id.* at 150:12.) As Intervenor notes, Appellants submitted lengthy briefing in opposition to the RSA Motion, undertook discovery, and participated in the multi-hour Hearing. (I's Br. at 51.) The Hearing transcript reveals that Judge Drain had a thorough understanding of Appellants' arguments. They had ample opportunity to be heard on their opposition to the RSA Motion.

The cases chiefly relied upon by Appellants do not conflict with the Bankruptcy Court's finding that there was no *sub rosa* plan. (*See* Appellants' Br. at 33-37.) *Czyzewski v. Jevic Holding Corp.* held that a bankruptcy court cannot "approve a structured dismissal that provides for distributions that do not follow ordinary priority rules without the affected creditors'

---

[15] In any event, as discussed further below, the record reflects that Debtors had a good business reason to sell. Garrick Venteicher, President and CEO of Empire Generating, Holdco, Holdings, and TKK Empire, testified that they undertook the sale because "[w]e need to reach finality with this project and get it set on a new course at a right-size balance sheet. We need finality for the employees. We need finality for the plant. And we need finality for the creditors." (Hearing Tr. at 82:7-11.) Judge Drain concluded, "Clearly, as a business matter, this transaction is a good one." (*Id.* at 150:18-19.) That Appellants objected to the sale does not mean that the Debtors lacked a sound justification.

consent." 137 S. Ct. 973, 983 (2017).  Putting aside that this appeal is of the order allowing assumption of the RSA, not of the Sale or Plan Orders, there is no allegation here that the proposed sale or plan result in priority skipping to which Appellants did not consent.  Rather, as discussed, Appellants complain that they lack control over the credit bid – which control they bargained away in the Intercreditor Agreement.  Second, *In re Iridium Operating LLC* involved the approval of a settlement between the debtors and lenders in which a secured creditor was not involved, 478 F.3d at 456, and there was no explanation presented to the Bankruptcy Court as to why the settlement impaired the rule of priorities, *id.* at 466.  Here, in contrast, the secured creditor bargained away its right to direct how the Collateral Agent would act, running the risk that its priority might be impaired, and all the cards were on the table before Judge Drain as to the reasons for the RSA.  Further, the Court in *Iridium* found the priority-impairing settlement was not a *sub rosa* plan because it had a good business justification benefiting the estate, *id.* at 467, as does the RSA here, as discussed below.

Thus, Judge Drain properly found that the RSA does not constitute a *sub rosa* plan.

b.  <u>Allowed Claims</u>

Appellants argue that the credit bid is impermissible under 11 U.S.C. § 363(k) because the Collateral Agent does not have an allowed claim against TTK Empire and therefore is not able to credit bid in a § 363 sale.  (Appellants' Br. at 47-54.)

Section 363(k) provides that "at a [§ 363] sale . . . of property that is subject to a lien that secures an allowed claim, . . . if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property."  11 U.S.C. § 363(k).  As a case cited by Appellants observes, "[i]t is beyond peradventure that a secured creditor is entitled to credit bid its allowed claim."  *In re Fisker Auto. Holdings, Inc.*, 510 B.R. 55, 59 (Bankr. D.

Del. 2014), *leave to appeal denied*, 2014 WL 546036, *and* 2014 WL 576370 (D. Del. Feb. 12, 2014). Here, the credit bid satisfies each element identified in the statute: the "allowed claims" are the obligations under the Credit Facility (that is, the secured claims against Empire Generating, Holdings, and Holdco), the "lien" is against TTK Empire's equity interest in Holdings (which TTK Empire pledged as security for the financing under the Credit Facility), and TTK Empire proposed to sell such interest. In other words, Debtors proposed a sale of property (TTK Empire's interest in Holdings) that was subject to a lien (the lien created when TTK Empire pledged that property), which secured an allowed claim (the lenders' claim against Empire Generating, Holdings, and Holdco under the financing facility). Under the plain language of § 363(k), if the holder of that claim (the lenders) purchases that property (TTK Empire's interest in Holdings), the holder may offset that claim against the price of the property, which is exactly what the lenders, through the Collateral Agent, proposed to do. There is no requirement in the statute that the allowed claim be against the same entity that is the owner of the liened property. The statute merely requires that – regardless of who owns the property – the property must secure an allowed claim, which TTK Empire's interest in Holdings does. As Intervenor points out, had Congress wanted to permit credit bids only where the lien on the property to be sold secured an allowed claim against the owner of the property, it could have done so. (I's Br. at 37.)[16]

---

[16] Appellants' contention that a credit bid is forbidden by the mutuality requirement present in other sections of the Bankruptcy Code is incorrect. The Collateral Agent holds a security interest in the collateral. It is not relying on a right to set off under § 553 of the Code, which requires mutuality. And, as discussed, there is no mutuality requirement in the text of § 363(k), the applicable section here. In light of Appellants' failure to introduce authority to the contrary, Judge Drain properly applied controlling law in concluding that "you always have the right to credit bid the debt." (Hearing Tr. at 141:16-17.)

The cases cited by Appellants on this point are unavailing. In *In re CS Mining, LLC*, the court found cause to limit a credit bid because the proposed purchaser's claim was subject to an objection, and therefore was not an "allowed claim." 574 B.R. 259, 284-85 (Bankr. D. Utah 2017). The court in *In re Fisker* capped a credit bid where it was unknown how much of a claim was secured. 510 B.R. at 61. And the court *In re Aéropostale* noted that "the secured creditor can, if it chooses, bid up the price to as high as the amount of its claim." 555 B.R. at 414 (internal quotation marks omitted). None of these cases stands for the proposition that the allowed claim must be against the seller of the liened property.

In the alternative, as Appellees contend, the Collateral Agent has a "claim" against TTK Empire. (Appellee's Br. at 39.) Congress intended the word "claim" in the Bankruptcy Code to bear the broadest possible definition. *Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991). Under § 101(5) and § 102(2) of the Bankruptcy Code, "[a] fair reading . . . is that a creditor who . . . has a claim enforceable only against the debtor's property nonetheless has a 'claim against the debtor' for purposes of the Code." *Johnson*, 501 U.S. at 85. Applying that principle here, the Collateral Agent has a claim against TTK Empire through the Pledge Agreement. (*See* Pledge Agreement § 6.25.)[17] That the pledge is non-recourse just means that the Collateral Agent can enforce it only against Debtor TTK Empire's property, not that the Collateral Agent does not have a "claim." In any event, as Judge Drain noted, (Hearing Tr. at 141:12-20), the Collateral Agent has the automatic right to credit bid up to the amount of its claim. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 644 & n.2 (2012). This right exists

---

[17] Appellees also note that TTK Empire waived the Collateral Agent's obligation to file a proof of claim in any bankruptcy case, (Pledge Agreement § 2.08(b)), which would be rendered superfluous if the Collateral Agent did not have the right to file a claim. I agree that this provision shows that the parties to the Pledge Agreement contemplated the Collateral Agent having a claim.

regardless of whether the Collateral Agent has recourse with respect to the seller.  *See* 11 U.S.C. § 1111(b)(1)(A); 7 Collier on Bankruptcy ¶ 111.03(1)(a).

Accordingly, the Bankruptcy Court properly applied the law when it rejected Appellants' argument that a credit bid was improper because there was no "allowed claim" against TTK Empire.

c.    <u>Violation of Intercreditor Agreement</u>

Appellants contend that the credit bid, as contemplated by the RSA Order, is invalid because it contravenes the duty of the Collateral Agent under the Intercreditor Agreement to act in the best interest of all secured lenders.  (Appellants' Br. at 54-58.)  The Intercreditor Agreement provides, in pertinent part, that the Collateral Agent "will act for the benefit solely and exclusively of all present and future Secured Parties."  (Intercreditor Agreement § 2.3.) Appellants contend that the credit bid requires the Collateral Agent to violate this duty by having it take action that "sacrifices" their interests, claims, and voting rights "for the purpose of benefiting Black Diamond."  (Appellants' Br. at 55.)  They argue that "the Minority Lenders never contractually delegated authority to the Collateral Agent to use their secured debt solely to benefit another party."  (Appellants' MFL at 13.)  But the plain language of the contract shows otherwise – Appellants authorized the Collateral Agent to act in their shoes through a collective-action mechanism by which the Majority Lenders can direct the Collateral Agent to credit bid or take other action to exercise remedies with respect to the collateral.  (*See* Intercreditor Agreement § 3.1(a) ("The Collateral Agent, acting upon an Act of the Secured Parties, shall have the exclusive right to enforce rights, exercise remedies . . . and make determinations regarding the release, sale, disposition or restrictions with respect to the Collateral."); *id.* § 1.1 (defining

"Act of the Secured Parties" as act by "Required Secured Parties," which is defined as holders of more than 50 percent of debt).)

While the credit-bid provision must be read in the context of the agreement as a whole, "so as to give full meaning and effect to all of its provisions," and "in accord with the parties' intent," as Appellants urge, (Appellants' Br. at 56 (internal quotation marks omitted)), the agreement must also be interpreted so as not to render any of its provisions a nullity, *see Walker v. Thompson*, 404 F. Supp. 3d 819, 825 (S.D.N.Y. 2019) ("Under New York law an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless is not preferred and will be avoided if possible.") (internal quotation marks and alteration omitted). Were Appellants' interpretation correct, the Collateral Agent's obligation to act on behalf of the secured parties would undermine, and in some circumstances eviscerate the Majority Lenders' right to direct the Collateral Agent to take actions. Not only must courts avoid interpretations that would render contract provisions meaningless, but if there were an inconsistency, a specific section, like section 3.1, takes precedence over a general one, like section 2.3. *See Oldcastle Precast, Inc. v. United States Fid. & Guar. Co.*, 458 F. Supp. 2d 131, 142 (S.D.N.Y. 2006) ("[W]here there is an inconsistency between a specific provision and a general provision of a contract, the specific provision controls.") (internal quotation marks omitted).

The unambiguous terms of the agreement, for which Appellants bargained, show that the Collateral Agent had no discretion not to credit bid when directed to do so. To hold that the credit bid somehow violated the Intercreditor Agreement would require ignoring the meaning of § 3.1 and the parties' intent in agreeing to it. Accordingly, Judge Drain did not err in approving

the assumption of a contract that contemplated the Collateral Agent acting in accordance with its contractual duties.

For the foregoing reasons, the Bankruptcy Court did not err when it did not, as part of his review of the RSA, find cause to limit the § 363 sale.

### 3.    RSA Approval Standard

Under 11 U.S.C. § 365(a) and § 1107(a), debtors can enter executory contracts, subject to court approval.  Typically, a bankruptcy court reviewing a decision to assume such a contract "should examine a contract and the surrounding circumstances and apply its best 'business judgment' to determine if it would be beneficial or burdensome to the estate to assume it." *Orion Pictures Corp. v. Showtime Networks, Inc.* (*In re Orion Pictures Corp.*), 4 F.3d 1095, 1099 (2d Cir. 1993).  "Courts generally will not second-guess a debtor's business judgment concerning whether the assumption or rejection of an executory contract or unexpired lease would benefit the debtor's estate," *In re MF Glob. Holdings Ltd.*, 466 B.R. 239, 242 (Bankr. S.D.N.Y. 2012), "provided that the debtor is not conflicted and has taken sufficient steps to maximize value." *In re Great Atl. & Pac. Tea Co.*, 544 B.R. 43, 49 (Bankr. S.D.N.Y. 2016). Transactions involving insiders "may" be subject to an "entire fairness standard," which examines "whether the process and price of a proposed transaction not only appear fair but are fair and whether fiduciary duties were properly taken into consideration." *In re Innkeepers USA Tr.*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010).

Judge Drain assessed business judgment under *Orion Pictures*, and noted that he did "not believe that [Appellants'] arguments [that the RSA involved conflicted insiders] raise a sufficient level of conflict of interest concerns to heighten the scrutiny beyond the scrutiny that [he] normally appl[ies] to these types of transactions, but that scrutiny is close, always."  (Hearing Tr.

at 17:15-18.)  Appellants urge that the Bankruptcy Court erred by failing to apply the entire fairness standard.  (Appellants' Br. at 59-63.)

First, Appellants argue that "the RSA was negotiated under the shadow of a clear conflict of interest" and not in good faith because Venteicher made decisions for seller TTK Empire while he was also an officer and director of TTK Empire's owner Tyr.  (Appellants' Br. at 60-61.)  Appellants do not explain how the interests of TTK Empire and its owner Tyr diverged so much as to displace the business judgment rule.  They contend that Tyr will receive "broad releases" under the RSA from claims by Debtors and "*de facto* releases from third parties (including Appellants)," whose claims would be extinguished by the credit bid.  (*Id.* at 60.)  But the RSA did not provide for any such releases, which the minority lenders admitted at the Hearing.  (Hearing Tr. at 127:10-17.)[18]  Judge Drain concluded that "based on the evidence before [him], it's hard to see how the RSA, which allows those [releases] to be determined still, is somehow not entered into at arm's length and in good faith."  (*Id.* at 127:18-21.)  He is affirmed in that respect.

Next, Appellants argue that the negotiations were conducted in a "shroud of secrecy." (Appellants' Br. at 62.)  But the record shows that Appellants were involved in negotiations for over a year, (Appellants' Br. at 9-10), and that Appellees continued to "welcom[e] continued negotiations," (Hearing Tr. at 137:15-22).  Indeed, Appellants ASSF IV AIV B Holdings III, L.P., and AEIF TRADE, LLC, together offered a competing bid before the Petition Date, indicating that they were kept in the loop of negotiations.  (Venteicher Decl. ¶ 50.)  In sum, I

---

[18] Indeed, even if claims could be released under the RSA, Appellants could not point to what any such claims would be.  (Hearing Tr. at 130:19-22.)

agree with Intervenor that "Appellants' purely speculative assertions cannot support a finding of 'conflicted dealing' that might warrant heightened scrutiny." (I's Br. at 25.)

The record shows that the Bankruptcy Court properly applied the business judgment standard. After examining the evidence, Judge Drain noted that Black Diamond's offer to enter into the RSA was a "good" transaction in which "Black Diamond said we'll pay everybody and eliminate the debt." (Hearing Tr. at 150:19-22.) He also found that the Debtors' choice was to enter a deal to get "all this [debt] off their balance sheet" or to endure "more months" of "hedge funds battling each other over control rights." (*Id.* at 151:13-16.) There was no question that the Debtors believed that the credit bid "represents far and away the best possible outcome for all of the Debtors' secured and unsecured creditors." (Venteicher Decl. ¶ 51.) "[T]he Debtors' liquidity needs [had also] bec[o]me more urgent." (*Id.* ¶ 43.) And, as mentioned above, Venteicher testified, "We need to reach finality with this project and get it set on a new course at a right-size balance sheet. We need finality for the employees. We need finality for the plant. And we need finality for the creditors." (Hearing Tr. at 82:4-10.) All of these factors support the conclusion that the transaction was sound. Judge Drain thus properly applied his own business judgment and, on this record, it was proper not to "second-guess" Debtors. *See In re MF Glob. Holdings Ltd.*, 466 B.R. at 242.

Further, even if the entire fairness standard applied here, which it does not, the RSA would satisfy it. For the reasons just discussed, and because there was "literally nothing more [for the Debtors] to ask for," (Hearing Tr. at 150:24-25), the deal was clearly in the best interests of the Debtors and their estates. Accordingly, any error would be harmless. *See Cullin v. Silverman*, No. 14-CV-4248, 2015 WL 1509583, at *3 (E.D.N.Y. Mar. 31, 2015) ("The harmless

error rule applies in bankruptcy appeals."), *aff'd* 633 F. App'x 16 (2d Cir. 2016) (summary order).[19]

Thus, Judge Drain did not abuse his discretion in approving the assumption of the RSA, and the RSA Order is affirmed in all respects.

## IV.  **CONCLUSION**

For the reasons set forth above, Appellants' motion for leave to appeal the Bid Procedures Order is DENIED.  The Bankruptcy Court's RSA Order is AFFIRMED in all respects.  The Clerk of Court is respectfully directed to terminate the pending motion, (No. 19-CV-5744 Doc. 3), and close Case Nos. 19-CV-5721 and 19-CV-5744.

**SO ORDERED.**

Dated:  March 23, 2020
         White Plains, New York

_Cathy Seibel_
_____
CATHY SEIBEL, U.S.D.J.

---

[19] Indeed, given Judge Drain's obvious thorough understanding of the proposed transaction and the fact that his scrutiny of it was "careful" and "close," (Hearing Tr. at 17:12-18), it is plain that he would have reached the same conclusion under the "entire fairness" standard.